IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SPENCER J. HARRIS,                             )
                                               )
                    Plaintiff,                 )
                                               )
v.                                             )   Case No. CIV-04-1482-T
                                               )
JAMES G. ROCHE, Secretary,                     )
Department of the Air Force,                   )
                                               )
                    Defendant.                 )

## MEMORANDUM DECISION

This matter is before the Court for disposition of claims under Title VII of the Civil Rights

Act of 1964 as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), following a nonjury trial held on

November 28-30, 2005.  This memorandum sets forth the Court's findings and conclusions pursuant

to Fed. R. Civ. P. 52(a).

### Trial Evidence

The case concerns Plaintiff's civilian employment by the Air Force.  Defendant James Roche

is a nominal party; the Air Force appeared at trial through a local management representative, Paul

Ketcherside, and by Assistant United States Attorneys, Robert A. Bradford and Kay Sewell and

Capt. Melinda Greene.  Plaintiff appeared personally with his attorneys, C. Craig Cole and Michael

Speck.  The Court heard the testimony of fourteen witnesses:  Plaintiff Spencer J. Harris; Beverly

Henning; Tamerlyn Clark; Theresa Thomas; Doug Davis; Gary Hampton; Dana Crowe; Kelly

Roberts-Malone; Shelley Deardorff; Joe Minor; Mike Jones; Steve Brown; Charles Swanson; and

Paul Ketcherside.  By stipulation, the Court admitted the following documents:  Plaintiff's Exhibit

Nos. 1-21C, 24A; and Defendant's Exhibit Nos. 1-22.  Plaintiff used the transcript of Beverly

Henning's deposition for impeachment purposes, and it was submitted in two volumes for the

Court's review solely for this purpose.  Defense counsel moved for the admission of Defendant's

Exhibit No. 23 and, over objection, utilized the document during cross-examination of Plaintiff.  The

Court reserved ruling on whether to admit this exhibit and related testimony pending the submission

of briefs.  The Court has now received the parties' briefs and rules on the evidentiary issues as

follows.

The proposed exhibit is a "Certificate of Release or Discharge from Active Duty" showing

Plaintiff's discharge from the Air Force "under honorable conditions" (less than an honorable

discharge) effective March 18, 1980, when he was nineteen years old.  Defendant first utilized the

document while cross-examining Plaintiff about his military service.  Defense counsel first

attempted to refresh Plaintiff's memory after he said he could not recall the reason for his discharge,

and later read from the document in asking Plaintiff why he was discharged.  Plaintiff's counsel

objected to any use of the document because it was neither listed in the Final Pretrial Report nor

disclosed before trial, and the Court also questioned whether the subject matter was relevant or

unduly prejudicial.  In post-trial briefs, Defendant contends the document is relevant to Plaintiff's

work history, damages, and credibility, while Plaintiff contends it as inadmissible character

evidence.

The Court sustains Plaintiff's objection to Defendant's Ex. 23.  This document may be

arguably relevant to Plaintiff's work history; it has no relevance to his damages or credibility.  The

document reflects military service over twenty-five years ago when Plaintiff was a teenager.  There

is no evidence Plaintiff's 1980 military discharge had any impact on his ability to obtain other

employment in 2002.  The document has no bearing on his credibility because it contains nothing

inconsistent with Plaintiff's trial testimony or even statements he allegedly made in the workplace. He did in fact have prior active duty military service. The sole purpose for which Defendant utilized the document at trial was to question Plaintiff about the reason for his discharge from military service and to suggest he behaved unsuitably toward authority then in much the same way he allegedly responded to supervisors during his civilian employment. Plaintiff is correct that the document is inadmissible for this purpose. Under the circumstances described here, any relevance of the document is far outweighed by its potential for prejudice. Neither Defendant's Ex. 23 nor Plaintiff's testimony concerning it will be considered by the Court in reaching a merits decision.

<u>Findings of Fact</u>

The stipulated facts include: On April 30, 2001, the Air Force hired Plaintiff to work as a Tool and Parts Attendant, WG-6904-06, in the Case/Frame Repair Unit of the Propulsion Directorate at Tinker Air Force Base. The Air Force required Plaintiff to serve a one-year probationary period and informed him that his appointment was subject to the completion of a one-year trial period beginning April 30, 2001. Plaintiff's immediate, first-level supervisor was Beverly Henning. His second-level supervisor was Charles Swanson.

The unit where Plaintiff worked was a production center that repaired engine parts used for fighter aircraft. It was one of four units in a section managed by Paul Ketcherside, who was then Section Chief. Plaintiff's unit was managed by Charles Swanson, who was then Unit Chief. Each unit had a tool "crib" or room that supported the workers in that unit and from which they could obtain tools, precision measuring equipment (PME), consumables and expendables, and other tooling needed to do their production jobs. Plaintiff was hired as part of a staffing plan developed by Mr. Ketcherside that would result in each tool crib having at least one full-time Tool and Parts

Attendant.  The duties of the position were to receive, store, issue, and update engine tooling and equipment, and to obtain certification of PME.  These duties had previously been performed by machinists, reworkers, or others, such as persons on limited duty assignments.

When Plaintiff began the job, the tool crib to which he was assigned was in disarray and needed substantial work to update the inventory list and to gain control of and accountability for the equipment and tooling used in the unit.  Plaintiff received no formal training on how to accomplish this.  He was generally informed of his duties by Mrs. Henning, who gave him a copy of the written job description and reviewed it with him, and he was introduced to other employees who were familiar with his job duties and could answer questions.  Mrs. Henning lacked first-hand experience in running a tool crib, and her time and attention were primarily focused on production issues.  As a result, Plaintiff's on-the-job training was self-directed and consisted largely of his studying Air Force regulations and procedures.  As he gained knowledge and experience, Plaintiff came to view the tool crib as his area.

One task facing Plaintiff was to complete an inventory of property assigned to his tool crib so that items that were missing, broken, or unaccounted for could be determined and an inventory list could be verified.  By regulation, a tool crib attendant was required to account for inventory daily by signing a Air Force Form 309, labeled "AFMC Tool Control Inventory Record" but commonly known as a "309 card."   In a well-organized tool crib, the verification of inventory and completion of a 309 card could be done in less than thirty minutes.  Due to the disorder and inaccurate inventory list in Plaintiff's tool crib, however, he was concerned about his ability to sign a 309 card truthfully.  Plaintiff discussed this concern with Mrs. Henning and obtained her approval

to suspend use of a 309 card until a thorough inventory of property assigned to the tool crib could be completed.

Plaintiff's written position description provided for his work to be assigned and supervised by a unit chief. Mr. Swanson, however, had delegated this responsibility to Mrs. Henning, a Machinist Supervisor or shop supervisor. This delegation of authority over Plaintiff to Mrs. Henning was a source of conflict. The trial evidence convincingly showed that Plaintiff routinely questioned Mrs. Henning about assignments, generally did not regard her requests as instructions to be followed, at times dismissed her instructions for the tool crib as mere suggestions, and repeatedly went over her head to make direct contact with Mr. Swanson and even third-level supervisor, Mr. Ketcherside. Both Mr. Swanson and Mr. Ketcherside testified credibly that this behavior was uncharacteristic of other employees and was a distraction. Both repeatedly instructed Plaintiff to follow Mrs. Henning's instructions and to accept her assignments. Neither took any other action toward Plaintiff, however, because Mrs. Henning was his direct supervisor. As Mrs. Henning's supervisors and mentors, they wanted her to manage her own employees.

Plaintiff's tendency to question his supervisor and resist her instructions was particularly uncharacteristic of a probationary employee and, according to numerous witnesses, was not a sensible attitude during probation. A probationary period permits a supervisor to evaluate a new employee for qualities and characteristics that cannot be adequately measured during the hiring process. These judgments may properly include any aspects of the employee's character, conduct, and attitude that directly affect job performance; they are inherently subjective. An adverse decision concerning a probationary employee may be reviewed only to determine whether it was arbitrary, capricious or unreasonable, unless discrimination or other impermissible factors are involved.

As Plaintiff's supervisor, Mrs. Henning was responsible for evaluating his job performance and certifying his completion of probation.  Plaintiff demonstrated a remarkable lack of concern, however, with her power over his appointment.  His attitude contrasted with that of a similarly situated employee, Tamerlyn Clark, who was hired a few months later as a second Tool and Parts Attendant for the same tool crib.  Although Mrs. Clark also expressed concern with Mrs. Henning's knowledge and management of the tool crib, Mrs. Clark's attitude toward her probationary status was that she should follow instructions and accept criticism or discipline from her supervisor.

Mrs. Henning's focus on production issues combined with her non-confrontational style of supervision caused her to experience little trouble with Plaintiff at first.  Two things, however, produced palpable conflict in late 2001.  Mrs. Henning first gave Plaintiff a written  appraisal in August, 2001.  The result was a midrange score of "5" or "Fully Successful" out of a possible "9" for "Outstanding" performance.  This was followed on November 30, 2001, with an "Interim Discussion" of five performance elements, which included critical elements of staying gainfully occupied, meeting quality requirements, keeping shop equipment and tools secure, and complying with established policies and regulations.  Mrs. Henning advised Plaintiff that he was meeting but not exceeding any of these elements.  She testified credibly at trial that Plaintiff was upset by this evaluation of his performance and believed he should have been given an "exceeds" rating.

In November or December, 2001, the unit also began to work toward a Maintenance Standardization and Evaluation Program (MSEP) inspection scheduled for May, 2002.  For the tool crib, this meant a push to account for all equipment and tools, to enforce sufficient check-out and sign-in procedures, and to complete the inventory that Plaintiff had been assigned over six months earlier.  Mrs. Henning became more focused on the operation of the tool crib and placed more

pressure on Plaintiff to accomplish assigned tasks.  She also assigned other employees to help in the tool crib.  Assistance was specifically provided for work that Plaintiff said he did not have time to do, such as completing the inventory and inlaying tools in drawers.  Plaintiff was not receptive to help from persons other than Mrs. Clark.

An incident occurred in January, 2002, on which Plaintiff placed great emphasis then and during trial.  While giving verbal instructions, Mrs. Henning attempted to convey the degree to which Plaintiff should exercise strict control over access to the tool crib.  For emphasis, she made a comment to the effect that he and Mrs. Clark should act like "tool Gestapo."  The comment was overheard by other employees.  To this, Plaintiff took personal offense.  He later went to Mrs. Henning's office to discuss it with her, and she expressed surprise at his reaction but apologized if she offended him.  Unsatisfied with this apology, Plaintiff went to Mr. Swanson and then to the EEO office and  lodged a complaint.  The complaint was later resolved and resulted in Plaintiff's receiving job-related training courses.  Plaintiff points to this EEO activity as the start of his difficulty with Mrs. Henning and the basis of his belief that later events were acts of reprisal.[1]

On March 5, 2002, the tool crib received an MSEP Focus Team Inspection, which was a pre-inspection assessment designed to identify and correct deficiencies before May, 2002.  The team found five deficiencies, although the visit occurred when neither tool crib attendant was present to assist in locating things.  One admitted deficiency was that the 309 card had not been used at all.  Mrs. Henning later reviewed the findings with the tool crib attendants and noted corrective actions, including "309 card complied with as of 4-2-02."  (Def.'s Ex. 8 at 86.)  Plaintiff testified that he and

---

[1] Neither Plaintiff nor Defendant provide documentation of the January, 2002, EEO activity, but it is undisputed Plaintiff made an EEO claim that was resolved either informally or by agreement.

Mrs. Clark were not given a firm deadline to complete the inventory and start using the 309 card and the only deadline he knew of was the May, 2002, inspection.  His testimony in this regard was not credible and was inconsistent with other evidence.  For example, Plaintiff stated he was prepared to sign the card when he reported for work on April 2, 2002, but he could not sign it that morning because it was missing from the tool crib.  Also, Mrs. Clark testified that Mrs. Henning required her to begin signing the 309 card at least by April, 2002, and she understood why Mrs. Clark gave her a "971 entry" or written reprimand when it was not signed.

On the morning of April 2, 2002, Mrs. Henning informed Plaintiff of a meeting at 9:00 A.M. that day with her and Mr. Swanson.  Mr. Swanson scheduled the meeting because Mrs. Henning had consulted him about her frustration in dealing with Plaintiff.  Mr. Swanson planned to discuss several issues, two of which were the 309 card and a piece of foam Plaintiff and Mrs. Clark had put on the side of the tool crib or "cage" to block people outside the cage from bothering them when they were working on the computer or doing paperwork.  Mrs. Henning testified credibly that she had previously asked Plaintiff to remove the foam, but he viewed it as unimportant and did not respond to her request.  During the meeting, Plaintiff characteristically questioned why the foam had to be removed until Mr. Swanson gave him a direct order to take it down.

Simply put, the April 2 meeting did not go well.  According to Plaintiff, there was a heated exchange on both sides, and Mr. Swanson was verbally abusive.  From the managers' view, Plaintiff was loud and disrespectful, and became agitated when they tried to discuss matters with him.  He attempted to leave the meeting (which he explained as a need to go to a prior appointment of which Mrs. Henning was aware), and when Mr. Swanson ordered him to sit down, he refused.  Mr. Swanson finally dismissed Plaintiff from the meeting because he would not listen or be seated.

Mrs. Henning decided termination was necessary as a direct result of Plaintiff's behavior at the April 2 meeting. She testified credibly that, while she had previously felt he was disrespectful toward her, she was swayed by his degree of disrespect directed at a second-level supervisor. After consulting her supervisors and the personnel office, she proceeded to prepare a 971 entry concerning both the April 2 meeting and performance issues. Mrs. Henning delivered the 971 entry dated April 9, 2002, to Plaintiff in her office on April 10, 2002. Plaintiff read it, questioned her about it, and made a written response, although he challenged her instruction that any response had to be made immediately in her office. Mrs. Henning completed the "Determination of Appropriate Action" portion of the form to state: "This matter is not resolved at this time." (Def.'s Ex. 8 at 80.) Plaintiff was asked to sign the bottom of the form but refused, and another supervisor was called to witness the refusal.

Also, supervisors Mike Jones and Joe Minor were asked to document complaints they had previously made to Mrs. Henning about Plaintiff's lack of cooperation. Each provided a memo dated April 9, 2002, but described incidents occurring in March, 2002, and November, 2001, respectively. Each supervisor had experienced a rude or unprofessional response when Plaintiff was asked to do something he considered "not his job." (Def.'s Ex. 8 at 82-83.) Both Mr. Jones and Mr. Minor testified credibly at trial about these encounters with Plaintiff, and efforts by Plaintiff's counsel to impeach them or to explain the incidents as misunderstandings were unconvincing.

With assistance from the personnel office, Mrs. Henning prepared a written notice of the decision to terminate Plaintiff's employment effective April 26, 2002, for failure to qualify during his probationary period. The notice was issued on April 17, 2002. The stated reasons for the decision were Plaintiff's discourteous behavior and his failure to comply with regulations and

procedures for his position.  Specific instances listed in the notice included his failure to certify the

tool crib inventory and sign the 309 card, his behavior during the April 2 meeting, and his behavior

toward other supervisors and employees (referring to employees who had complained to Mrs.

Henning about Plaintiff's treatment of them when they attempted to assist him or when they asked

him to help with deliveries to the tool crib).  Although Mrs. Henning was laboriously cross-

examined about the wording of this document, the Court finds no significant discrepancy between

it and Mrs. Henning's explanation at trial of the problems she experienced with Plaintiff.  What she

euphemistically called "discourteous behavior" in a formal document, she stated succinctly at trial

to be disrespect for her and a "bad attitude" toward authority.

The evidence showed that other managers independently reached similar conclusions about

Plaintiff based on personal contacts with him.  All three of Plaintiff's supervisors found his behavior

to be a distraction from the production mission of his unit.  The Court found Mr. Ketcherside's trial

testimony to be particularly persuasive.   Mr. Ketcherside is an experienced manager, but

significantly, one with a long history of service to a civilian employees' labor union, the American

Federation of Government Employees (AFGE).  He has served in local positions as shop steward,

chief steward, divisional director, and president for two terms, and a one-year term as Executive

Director of National Council 214 in Dayton, Ohio.  With his long history of both working for the

welfare of workers and in management roles, Mr. Ketcherside spoke with credibility and authority

and from personal observation, since Plaintiff came to him several times to complain about Mrs.

Henning and particular assignments.  In Mr. Ketcherside's opinion, Plaintiff was insubordinate, by

which he meant unwilling to accept authority.  Although Mrs. Henning was the decision maker, the

supporting views of Mr. Ketcherside and Mr. Swanson refute Plaintiff's suggested inference that

her judgment about Plaintiff was influenced by the fact that she had been the subject of his EEO complaints.

In addition to his January, 2002, EEO complaint, Plaintiff made EEO complaints on April 2 (concerning the meeting that day), April 16 (concerning the April 10 discipline), and April 17 (concerning the termination notice). Mrs. Henning admits she learned of the April 2 complaint on the same day it was made. It is unclear when she learned of the others, but under the Court's findings, Mrs. Henning had already decided to terminate Plaintiff's employment before the latter two complaints were made.

Plaintiff exhausted all administrative remedies concerning his termination and timely filed suit on claims of racial discrimination and retaliation. Before trial, however, Plaintiff abandoned his claim of discrimination based on race. This is evident from the Final Pretrial Report, in which Plaintiff lists contentions and legal issues only concerning retaliation. Plaintiff's trial counsel confirmed this narrowing of the case in his opening remarks by stating the case is about reprisal. Similarly, the only claim mentioned in Plaintiff's post-trial filings is one of retaliatory discharge. The Court rules on the claim submitted for decision as follows.[2]

### Analysis

The Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5 and § 2000e16. Plaintiff seeks to prove retaliatory discharge under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This framework is not useful in the context of this case.

---

[2] If Plaintiff had not abandoned his claim of racial discrimination, the Court would reach the same conclusions stated below and concluded Plaintiff failed to prove such a claim.

Plaintiff easily established a *prima facie* case of retaliation.  He engaged in protected activity by utilizing the EEO procedures available to government employees; he subsequently suffered an adverse employment action; and a close temporal proximity linked the two events.  *See Annett v. University of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004); *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).  The Air Force also easily satisfied its burden to produce evidence of a legitimate, non-retaliatory reason for its action.  Contrary to the position suggested by Plaintiff's post-trial submissions, this is a burden of production only and not one of proof.  The burden of persuasion remains at all times with Plaintiff.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998).

The dispositive issue is whether Plaintiff has shown, more likely than not, the Air Force's stated reasons are pretextual and Mrs. Henning was actually motivated by his EEO activity.  Plaintiff need only show that retaliation was a substantial or motivating factor in his termination.  *See Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1213 (10th Cir. 2002); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999).

Plaintiff attempted to undermine the reasons given by Mrs. Henning for her decision by pointing to inconsistencies in her testimony as well as a passage from her deposition that could be read to say his EEO complaint "added to" or "prompted" her decision.  Placing the deposition testimony in context, particularly in view of the errata sheet appended to the second volume, Mrs. Henning did not so testify.  In attempting to explain why she did not counsel Plaintiff about his attitude, she testified that their repeated confrontations made her disinclined to talk to him about it.  Mrs. Henning had no obligation, however, to counsel a probationary employee about a matter of common sense, that is, to stop continually questioning and resisting the authority of his direct

supervisor.  Plaintiff in fact received this exact advice from Mr. Swanson and Mr. Ketcherside but failed to heed it.  Mrs. Henning's testimony was unequivocal that Plaintiff's EEO activities played no part in her decision to terminate his probationary employment.  While she may not have been a strong witness, or even a strong supervisor during Plaintiff's employment, Plaintiff failed to counteract this key aspect of Mrs. Henning's testimony.

Plaintiff also failed to show the stated reasons for his termination were false or pretextual. Plaintiff's evidence of pretext was his own testimony that Mrs. Henning, and perhaps Mr. Swanson, set him up and secretly wanted to remove him because of his January EEO complaint.  The Court was not persuaded by this testimony.  The Court finds in the trial evidence no indication that the decision to end Plaintiff's probationary employment was motivated by retaliation.  Even accepting Plaintiff's evidence that he was placed in a newly created, demanding position and given inadequate training and support to accomplish the work, there was no evidence this was done because he filed EEO complaints.  Similarly, the testimony of Plaintiff's witnesses that he was a good tool crib attendant and they saw no discourteous behavior also is not probative.  Notably, Plaintiff did not have one supervisory-level witness in his favor.  The evidence showed that it was Plaintiff's attitude and behavior toward supervisors that caused his termination, and all supervisory witnesses supported Mrs. Henning's view of Plaintiff's workplace conduct and attitude.  Although Mrs. Clark was in many respects similarly situated to Plaintiff, both the degree and duration of Plaintiff's resistance toward Mrs. Henning distinguished him from Mrs. Clark.  Thus the fact Mrs. Clark was not terminated provides no basis to infer that Plaintiff's discharge was retaliatory.

Plaintiff was a probationary employee.  His supervisor was required to certify satisfactory completion of probation based on an evaluation of his job performance, work behavior, conduct, and

most significantly here, his attitude.  Based on this last criteria alone, the trial evidence fully supported Mrs. Henning's determination that Plaintiff was unlikely to give satisfactory government service.  Numerous witnesses other than Mrs. Henning – coworkers and supervisors alike, including Deardorff, Minor, Jones, Brown, Swanson and Ketcherside – variously described Plaintiff's attitude and conduct as rude, loud, insubordinate, disrespectful, discourteous and uncooperative.  Regardless which adjective is chosen, these witnesses were virtually unanimous in portraying an employee of unsuitable attitude and demeanor.  This evidence permits the Court confidently to conclude that Mrs. Henning's decision not to certify Plaintiff for permanent employment was fully justified and non-retaliatory.

In short, the Court concludes Plaintiff has failed to carry his burden of proof.  The Court finds the termination decision was not motivated by Plaintiff's protected activity and there was no retaliatory discharge in violation of 42 U.S.C. § 2000e-3.

Conclusion

The Court finds in favor of Defendant James G. Roche and against Plaintiff Spencer J. Harris on all claims.  Judgment will be entered accordingly.

Entered this  28th  day of December, 2005.

_____

RALPH G. THOMPSON
UNITED STATES DISTRICT JUDGE